**EL PASO COUNTY WATER IMPROVE-MENT DISTRICT NO. 1, L. D. Mc-Comas, Francis J. Warnock, J. S. Samples, Marion Briggs and W. L. Summers, together with the United States of America, Plaintiffs,**

v.

**CITY OF EL PASO, Defendant.**

**Civ. A. No. 1409.**

United States District Court
W. D. Texas, El Paso Division.

August 1, 1955.

Burges, Scott, Rasberry & Hulse, El Paso, Tex., Edwards, Belk, Hunter & Kerr, El Paso, Tex., for plaintiff El Paso County Water Improvement District No. 1.

Russell B. Wine, U. S. Atty., San Antonio, Tex., Holvey Williams, Asst. U. S. Atty., El Paso, Tex., for plaintiff United States.

Hardie, Grambling, Sims & Feuille, El Paso, Tex., H. E. Brockmoller, El Paso, Tex., Guinn & Guinn, El Paso, Tex., for defendant City of El Paso.

DOOLEY, District Judge.

This suit primarily is a contest over the rights to the waters of the Rio Grande River in the vicinity of El Paso, Texas, but along with that are a cluster of satellite controversies. The frame of the principal dispute is that the plaintiffs, El Paso County Water Improvement District No. 1, a political subdivision of Texas, together with some individuals owning land in said district, and the United States of America, contend that the waters in question have been committed to the needs and uses of a federal reclamation development, lying partly in New Mexico and partly in Texas along the river, including the territory of plaintiff district, and known as "The Rio Grande Project", under senior appropriations made by the government in the Territory of New Mexico, and a senior appropriation in Texas assigned to the government, but the defendant City claims that it has a priority of some measure in such water as a riparian land owner, and also by appropriation rights under a permit issued by the Board of Water Engineers of Texas, as well as other ways. The ramification of details will be supplied later, as the opinion moves from one part to another of the law suit.

Rio Grande Waters

██ ██ The Rio Grande is not only a river of song and story, but also a symbol of the Spanish heritage in what is now the American Southwest. It is the second longest river in the United States and is the only river of this country having long segments first wholly within this nation and next forming an internatonal boundary. The physical aspects of the river, as it stretches through hundreds of miles of arid territory, make an environment quite unlike the rivers of humid climes and verdant lands such as England or the eastern seaboard of this country, where the doctrine of riparian water rights is dominant. The full strength common law riparian rule in a nutshell is, "the river runs, let it run on and on". The Rio Grande was not made for such a riparian law world. It has never been dependably navigable in fact on any general scale within the span of history, except to a limited extent in the lower reaches of the river. Obviously, by the order of nature, it was destined for use in irrigation of the valleys along its banks and it has been such a life line for hundreds of years. The Indians first and the Spaniards next began such use of the river. The acequias of the Spaniards go back to the 17th century. The community of Ysleta, a few miles south of El Paso, is among the oldest settlements of the kind.[1] The riparian rights principle has never been recognized in New Mexico and has been strictly modified in Texas, but appropriative water rights are in the law of both States. The clash between the two kinds of water rights and property, particularly in the western half of the United States, is familiar history, but more of such comparative water law later.

The Reclamation Act was approved June 17, 1902,[2] and in 1905 Congress authorized the Rio Grande Project.[3] In 1906 the government, acting by a Supervising Engineer of the Reclamation Service in the Department of the Interior, in conformity with a statute of the Territory of New Mexico,[4] filed a writ-

---

1. Hutchins, "The Community Acequia: Its Origin and Development"—Southwestern Historical Quarterly, 31:261–284 (1928)

2. 32 Stat. 388, 43 U.S.C.A. Ch. 12.

3. Act February 25, 1905, 33 Stat. 814.

4. Law of 1905, Section 22, Chapter 102,

ten claim to appropriate 730,000 acre-feet per year from the unappropriated waters of the Rio Grande at the later site of the Elephant Butte Dam, to serve the Rio Grande Project; and in 1908 similar notice of claim was filed by the government, but this time to take all of the unappropriated waters of the Rio Grande and its tributaries, for the same use above specified, in conformity with a later statute of the Territory of New Mexico.[5]

In 1880 some desultory correspondence in diplomatic channels began between the United States and Mexico over mutual grievances about the diversion and use of Rio Grande waters in the vicinity of El Paso, Texas, and Juarez, Mexico, and was renewed in 1894, growing more persistent all the time, until it was finally resolved by a Treaty, or Convention, between the United States and Mexico, of May 21, 1906.[6]

The planning of the Rio Grande Project, and the settlement of differences with Mexico went hand in hand. The integration of the Project and the Convention is manifest from the first two articles of the Treaty.[7]

36th Legislative Assembly of the Territory of New Mexico.

5. The notice aforesaid reads in material part as follows:

"Claiming and reserving all rights under our former notice of January 23, 1906, * * * I do now hereby give you the following notice, in addition to said former notice and supplemental thereto.

"The United States acting under authority of * * * the Reclamation Act * * * proposes to construct within the Territory of New Mexico certain irrigation works in connection with the so-called Rio Grande Project. The operation of the works in question contemplates the diversion of the water of the Rio Grande River.

"Section 40, of Chap. 49 of the laws enacted in 1907 by the 37th Legislative Assembly of the Territory of New Mexico, an act entitled: 'An Act to conserve and regulate the use and distribution of the waters of New Mexico; to create the office of Territorial Engineer; to create a Board of Water Commissioners, and for other purposes', approved March 19, 1907, reads as follows:

" 'Whenever the proper officers of the United States * * * shall notify the territorial engineer that the United States intends to utilize certain specified waters, the waters so described, and unappropriated * * * shall not be subject to a further appropriation under the laws of the Territory for a period of three years from the date of said notice, within which time the proper officer of the United States shall file plans for the proposed work in the office of the territorial engineer * * * and no adverse claim * * * initiated subsequent to the date of such notice shall be recognized under the laws of the Territory, * * *

Provided, That in case of failure to file plans * * * as herein required, the waters specified in the notice * * * shall become public waters, subject to general appropriations.'

"In pursuance of the above statute of the Territory you are hereby notified that the United States intends to utilize the following described waters to-wit:

"All the unappropriated water of the Rio Grande and its tributaries, * * *

"It is therefore requested that the waters above described be withheld from further appropriation and that the rights and interests of the United States in the premises be otherwise protected as contemplated by the statute above cited."

6. 34 Stat. 2953. Simsarian, "The Diversion of Waters Affecting the United States and Mexico", Texas Law Review, Volume XVII, No. 1, page 27.

7. "Article I. After the completion of the proposed storage dam near Engle, New Mexico, and the distributing system auxiliary thereto, and as soon as water shall be available in said system for the purpose, the United States shall deliver to Mexico a total of 60,000 acre-feet of water annually, in the bed of the Rio Grande at the point where the head works of the Acequia Madre, known as the Old Mexican Canal, now exists above the City of Juarez, Mexico.

"Article II. The delivery of the said amount of water shall be assured by the United States and shall be distributed through the year in the same proportions as the water supply proposed to be furnished from the said irrigation system to lands in the United States in the vicinity of El Paso, Texas, according to the following schedule, as nearly as may be possible:

* * * * *

The Congress appropriated funds for the construction of the Elephant Butte Dam, as the main unit, or facility, of the Project, in 1907, and thereafter the work progressed from stage to stage, taking a number of years, until completed. The total costs have been over $20,000,000.

The Legislature of Texas in 1913 enacted a comprehensive act [8] regulating the water resources of Texas and providing for an administrative Board of Water Engineers. This statute made it necessary for holders of old water right appropriations under earlier laws to file a certificate thereof, as well as certain specified information, with the newly created Board of Water Engineers. In 1914, the United States, by its Project Manager of the Rio Grande Project, made such certified filing in compliance with said law in respect to the declaration of water appropriation filed by Loomis and others in 1889, and later acquired by the United States, (as again mentioned hereafter) but a reservation of all rights was inserted in said certified filing.[9]

The United States, as owner of the physical works and facilities of the water storage and irrigation system built and being built to serve the Rio Grande Project, and the El Paso County Water Improvement District No. 1, thereunto duly authorized, signed a contract dated January 17, 1920, covering improvements and irrigation service for District lands as a component part of said Project and, by the terms thereof, the said District became obligated to pay the United States a maximum of nearly $5,-000,000 in reimbursement for its proper part of the construction costs for the works, facilities and irrigation system to be used in carrying on the functions of the Project, and previously a somewhat similar contract, dated January 7, 1918, had been executed between the United States and the Elephant Butte Irrigation District of New Mexico, and lands within that District were thereby made the other component part of said Project. A few months after the first contract mentioned, the said El Paso County Water Improvement District No. 1 was enlarged by consolidation with another district and thereafter the additional lands, coming from said consolidation, were also brought into said Project by agreement with the United States.

On March 18, 1938, the states of Colorado, New Mexico and Texas, by their duly appointed Commissioners, "desiring to remove all causes of present and future controversy among these states and between citizens of one of these states and citizens of another state with respect to the use of the waters of the Rio Grande above Fort Quitman, Texas," executed a compact, signed by said Commissioners respectively, and also signed for approval by the duly appointed representative of the United States. The compact was ratified by Colorado February 21, 1939,[10] by New Mexico March 1, 1939,[11] and by Texas March 1, 1939,[12] and was approved by the United States May 31, 1939.[13]

"In case, however, of extraordinary drouth or serious accident to the irrigation system in the United States, the amount delivered to the Mexican Canal shall be diminished in the same proportion as the water delivered to lands under said irrigation system in the United States."

8. General Laws, Regular Session of the 33rd Legislature, Chapter 171.

9. The language of such reservation reads as follows:
 "For the purpose of information and in compliance with the provisions of Chapter 171, General Laws of the State of Texas, 33rd Regular Session of the Legislature, so far as may be, but without waiving any rights of the United States, or its successors in control of any of the works hereinafter mentioned, by reason of this compliance with said provisions, this statement is made by and on behalf of the United States of America * * *."

10. Laws 1939, Chapter 146.

11. Laws 1939, Chapter 33.

12. Acts 1939, 46th Legislature, Special Laws, p. 531.

13. Public Act No. 96, 76th Congress, 53 Stat. 785.

Article I of the Compact enumerates several definitions and the ones presently most material are quoted in the margin.[14]

Article II designates stream gauging stations.

Article III defines the obligation of Colorado to deliver water at the Colorado-New Mexico state line.

Article IV defines the obligation of New Mexico to deliver water into the Elephant Butte Reservoir at San Marcial, New Mexico, (which is some 125 miles above the point where the river leaves New Mexico and becomes the International Boundary between the United States and Mexico.)

Article VIII has material bearing and is set out in the margin.[15]

Articles IX, X, XI, XII, XIII, XVI and XVIII are immaterial in this controversy, but the remaining two Articles, Articles XIV and XV, are pertinent and will be found in the foot note.[16]

An application by the City of El Paso, dated September 23, 1948, was filed with the Board of Water Engineers of Texas on November 1, 1948, for a permit to appropriate, store and divert 27,000 acre-feet of water per annum "of the unappropriated storm and flood waters of the State of Texas, and the unused return flow water of the Rio Grande Project of the Bureau of Reclamation of the Department of the Interior, for municipal and domestic use, from the Rio Grande in El Paso County, Texas."

It was proposed to impound 16,000 acre-feet per annum in a storage reservoir and to take the remaining 11,000 acre-feet per annum by direct diversion of return and flood waters without the use of storage. The City's plan, as outlined in said application, definitely relied upon making use of the American Dam, (located only about 100 feet upstream in the Rio Grande from the intersection of the International Boundary Line between the United States and Mex-

14. " 'Project Storage' is the combined capacity of Elephant Butte Reservoir and all other reservoirs actually available for the storage of usable water below Elephant Butte and above the first diversion to lands of the Rio Grande Project, but not more than a total of 2,638,860 acre-feet.

" 'Usable Water' is all water, exclusive of credit water, which is in project storage and which is available for release in accordance with irrigation demands, including deliveries to Mexico.

" 'Credit Water' is that amount of water in project storage which is equal to the accrued credit of Colorado, or New Mexico, or both."

" 'Actual' Release' is the amount of usable water released in any calendar year from the lowest reservoir comprising project storage.

" 'Actual Spill' is all water which is actually spilled from Elephant Butte Reservoir, or is released therefrom for flood control, in excess of the current demand on project storage and which does not become usable water by storage in another reservoir; provided, that actual spill of usable water cannot occur until all credit water shall have been spilled."

15. "During the month of January of any year the Commissioner for Texas may demand of Colorado and New Mexico,

and the Commissioner for New Mexico may demand of Colorado, the release of water from storage reservoirs constructed after 1929 to the amount of the accrued debits of Colorado and New Mexico, respectively, and such releases shall be made by each at the greatest rate practicable under the conditions then prevailing, and in proportion to the total debit of each, and in amounts, limited by their accrued debits, sufficient to bring the quantity of usable water in project storage to 600,000 acre-feet by March first and to maintain this quantity in storage until April thirtieth, to the end that a normal release of 790,000 acre feet may be made from project storage in that year."

16. "Article XIV. The schedules herein contained and the quantities of water herein allocated shall never be increased, nor diminished by reason of any increases or diminution in the delivery or loss of water to Mexico.

"Article XV. The physical and other conditions characteristic of the Rio Grande and peculiar to the territory drained and served thereby, and to the development thereof, have actuated this Compact and none of the signatory states admits that any provision herein contained establishes any general principle or precedent applicable to other interstate streams."

ico with the river) and the American Irrigation Canal and the Franklin Canal, all property of the United States, although the City at that time had no authority or agreement from the United States to so use such government facilities for carriage of any water under its requested appropriation permit to the City water plant. (The City, later in a contract dated August 10, 1949, between it and the plaintiff District, approved by the United States, did stipulate for such use of the government's works and facilities, subject to certain conditions, but the City now assails the validity of that contract.) The United States, joined by the El Paso County Water Improvement District No. 1, as protestants, filed opposition to said application for a water permit and the grounds, after being detailed fully, were summarized in such protest.[17]

The Fort Quitman Land Company, the owner of farming lands on the south of the Hudspeth County Conservation and Reclamation District No. 1, and also several owners of lands in the last mentioned district, also filed their protests against the City's application. The interest of said District, adverse to the City, resulted from a contract, dated December 1, 1924, between the United States and the District, executed under the authority of the Warren Act of February 21, 1911,[18] wherein the Government agreed to deliver to the District at the terminus of the Tornillo Main Canal in the Rio Grande Project, each irrigation season, "such water from the Project as may be available at said terminus without the use of storage from Elephant Butte Reservoir", for use in irrigation, in other words, the left-over water from the Project. The City and the various protestants finally made an ostensible settlement of their contest precipitated by the application of the City for a water permit, and the key to such settlement was the aforesaid contract executed in the meantime on August 10, 1949, (to be fully noticed later) as shown by copy attached to a separate stipulation, signed by the parties under date of December 1, 1949, and filed with the Board of Water Engineers. In said stipulation the protestants withdrew their opposition to the City's application, but this action was qualified by an express reservation and condition.[19]

On May 10, 1950, The Board of Water Engineers of Texas granted the City's application by a permit order, without

17. The summary, which is sufficient to make the issues clear, reads as follows:

"It is therefore respectfully submitted to the Board:

"(a) That there are no unappropriated waters in the Rio Grande subject to appropriation by the City of El Paso;

"(b) That the proposed use by the City conflicts with the existing water rights appropriated by the United States for and on behalf of the lands of the Rio Grande Project, which are now and long since have been applying said waters to beneficial use, and on behalf of lands in Mexico, rights to which are in pursuance of an existing treaty between the United States and the Republic of Mexico;

"(c) That the granting of a permit under the application made by the City without any contract or other means of determining relative rights of the City and those of the Rio Grande Project water users and of the Hudspeth County Water Conservation and Reclamation District No. 1 under Warren Act contract with the United States, and water users of Mexico under treaty between the United States and the Republic of Mexico, and of other inchoate rights in the stream under permits issued by your Board, will be detrimental to the public welfare."

18. 36 Stat. 925, Title 43 U.S.C.A. §§ 523–525.

19. That part of the stipulation is here quoted:

"The rights of the City of El Paso under the terms of such permit as this Honorable Board shall see fit to grant in these proceedings, shall stand expressly conditioned by and made subject to the terms and conditions of that certain contract between the City of El Paso, applicant, and the El Paso County Water Improvement District No. One, hereinabove referred to, copy of which is attached hereto, marked for identification Exhibit 'A', as such contract has been interpreted, and as so interpreted approved by the Secretary of the Interior in his letters referred to in Article IV hereof."

making any mention therein, however, of the settlement between the parties, which was reflected in the signed stipulation then on file with the Board. On the other hand, the previously mentioned contract of August 10, 1949, was the only possible antecedent to justify the directions in said Permit for the use of works and facilities belonging to the United States in the service of the City. Enough of the Permit for an understanding thereof is herein quoted.[20]

The national government, in cooperation with the Republic of Mexico,[21] has undertaken and completed an immense program of rectification to shorten the channel of the Rio Grande by many miles between El Paso and Fort Quitman. The State of Texas ceded to the United States all of its right, title and interest in the bed and banks of the Rio Grande in El Paso County and Hudspeth County, which were within the range of said rectification work.[22] Later, the United States also has carried out canalization of the river, between Caballo Reservoir and the American Dam, under the authority of Congress.[23] The rectification was not but the canalization is an irri-

gation adjunct. Several miles of El Paso river front lies between their termini at the edge of Cordova Island and at the American Dam a few miles above El Paso. These works, one up and one down river from the City, do not seem truly material to the present litigation.

This brings the discussion to the grounds in support of the conflicting claims herein to the waters of the Rio Grande. The plaintiffs' main contention, in brief, is that the constituent land owners in the Rio Grande Project territory, pursuant to the water appropriations made by the United States in New Mexico and the Loomis appropriation in Texas, (a later subject herein), have acquired a vested right to the water in question, superior to any claims made by the defendant City, and, moreover, that the State of Texas by legislation has subordinated its laws governing water rights to the irrigation program of the Project. In contrast the defendant City takes the position that Rio Grande water entering Texas, even though same is being handled by the United States for the Project, becomes subject to the laws of Texas and that under such law the de-

20. "Now, therefore, the Board of Water Engineers, * * * grant this permit unto the said City of El Paso, * * * to divert, appropriate and use * * * an amount of the public waters of the State of Texas, not exceeding 27,000 acre-feet per annum, to consist of the unappropriated or unused storm, flood and return waters of the Rio Grande in El Paso County, Texas, * * * or so much thereof as may be necessary, * * * when beneficially used, for supplying the municipal and domestic needs of the said City of El Paso and its residents, the appropriation and diversion of such waters to be effected in the manner following:

"(a) The City of El Paso shall have the right hereunder to impound not to exceed 16,000 acre-feet per annum of said total of 27,000 acre-feet per annum in a storage reservoir, to be constructed * * * about 13.8 miles upstream from the American Dam, and located on the west side of the Rio Grande, * * * the water so stored to be released into the Rio Grande as needed by the City; and

"(b) The City of El Paso shall have the right hereunder to appropriate and use not to exceed 11,000 acre-feet per annum of said total of 27,000 acre-feet per annum, by direct diversion of return and flood waters, without the use of storage, such waters to be diverted from the Rio Grande at the American Diversion Dam, * * * and conveyed through the American Irrigation Canal and the Franklin Canal to the City's water treating plant, where it will be rediverted from the canal to the plant, or said water, or any portion thereof, may be diverted directly from the Rio Grande at the water treating plant, through facilities provided, or to be provided, by the said City of El Paso, Texas."

21. Convention, or Treaty, of February 1, 1933, 48 Stat. 1621.

22. Act of September 22, 1934, 43rd Legislature, 3rd Called Session, Ch. 15, p. 29.

23. Joint Resolution of February 13, 1935, 49 Stat. 24. Act of August 29, 1935, 49 Stat. 961. Act of June 4, 1936, 49 Stat. 1463.

fendant, as a municipality, has a superior appropriation right to such water for domestic and municipal requirements. Riparian rights are also claimed.

■ The plaintiffs rely heavily on the language in the Reclamation Act that Project water "shall be appurtenant to the land irrigated",[24] but that provision must be construed consistently with another section of the Reclamation Act, upholding the force of State laws.[25]

This respect for the state laws was no casual policy, as the same pattern is found in the Federal Power Act,[26] and again in the Ferris Public Lands Bill, H. R. No. 408, 64th Congress, First Session,[27] and again somewhat similarly in the Warren Act,[28] and the Flood Control Act of 1944.[29]

■ Such consistent purpose to avoid disturbance of state authority makes it very doubtful that the fact water rights in a reclamation project become "appurtenant to the land irrigated", renders such water rights immune to state law, which, without attempting to nullify such water rights, simply declare same inferior and subject to the priority of higher uses of the water fixed by the state law. The water right under the Reclamation Act is in the nature of property and, broadly, is a vested right,[30] although it just as well fits other terms,[31] since, after all, the statute declares that

---

24. Title 43, U.S.C.A. § 372:
 "Right to the use of water acquired under the provisions of the reclamation law shall be appurtenant to the land irrigated, and beneficial use shall be the basis, the measure, and the limit of the right."

25. Title 43, U.S.C.A. § 383:
 "Nothing in this chapter shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State or Territory relating to the control, appropriation, use, or distribution of water used in irrigation, or any vested right acquired thereunder, and the Secretary of the Interior, in carrying out the provisions of this chapter, shall proceed in conformity with such laws, and nothing herein shall in any way affect any right of any State or of the Federal Government or of any landowner, appropriator, or user of water in, to, or from any interstate stream or the waters thereof."
 See parallel statute: 16 U.S.C.A. § 590z—1(b).

26. 41 Stat. 1063, as amended 49 Stat. 838, 16 U.S.C.A. § 821:
 "Sec. 27. That nothing herein contained shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

27. "Sec. 13. That nothing in this act shall be construed as affecting or intended to affect, or to in any way interfere with the laws of any state relating to the

control, appropriation, use, or distribution of water."

28. Act of February 21, 1911, 36 Stat. 925, Title 43, U.S.C.A. § 524:
 "In carrying out the provisions of the reclamation law, the Secretary of the Interior is authorized, * * * to cooperate with irrigation districts, * * * for the construction or use of such reservoirs, canals, or ditches as may be advantageously used by the Government and irrigation districts, * * * Provided, That nothing contained in this or the preceding section shall be held or construed as enlarging or attempting to enlarge the right of the United States, under existing law, to control the waters of any stream in any State."

29. Act of December 22, 1944, Ch. 665, 58 Stat. 887:
 "In connection with the exercise of jurisdiction over the rivers of the Nation through the construction of works of improvement, for navigation or flood control, as herein authorized, it is hereby declared to be the policy of the Congress to recognize the interests and rights of the States * * * in water utilization and control, as herein authorized to preserve and protect to the fullest possible extent established and potential uses, for all purposes, of the waters of the Nation's rivers; * * *." 33 U.S.C.A. § 701—1.

30. Ickes v. Fox, 300 U.S. 82, 57 S.Ct. 412, 81 L.Ed. 525.

31. State of Washington v. State of Oregon, 297 U.S. 517, 56 S.Ct. 540, 80 L. Ed. 837, ("Privilege"). Federal Power Commission v. Niagara Mohawk Power Corp., 347 U.S. 239, 246, 74 S.Ct. 487, 98 L.Ed. 666, ("Usufruct").

"beneficial use shall be the basis, the measure, and the limit of the right". In other words, such water right, unlike a fee simple title, is not a fixed and absolute estate, but, instead, is a defeasible interest, which never comes to rest, but is always at the risk of loss by unjustifiable delay in making or continuing beneficial use thereof. These water rights, however, denominated, in any event are subject to the restraints in the Reclamation Act, and it is beyond reach to reconcile their finality as asserted by the plaintiffs with the integrity of the state law.

The proposition has been settled in litigation of state against state in the Supreme Court, to determine their relative rights in the waters of an interstate river, that the upstream state has no right to appropriate all of the water and let the downstream state go empty-handed.[32] If, in this instance, the appropriation filed years ago by the United States in the Territory of New Mexico should render that part of the water taken thereunder, which finds its way into Texas, untouchable by the policy of water rights and appropriations under the law of Texas, then, indeed, New Mex-

ico has practically captured all of the waters of the Rio Grande upstream and excluded Texas from exercising any free control over same in its own way, and that cannot be justified in law, unless it has been done by the sovereign consent of Texas. This must be so if there is any tangible reality in the provision leaving the state laws intact under the terms of the Reclamation Act and any thought that such proviso was an empty gesture has been rejected several times by the Supreme Court.[33]

The Federal Court, Southern District of California, where prolonged litigation, with some factual similarity to this suit, is pending, has rendered an opinion much in point.[34]

The plaintiffs' counsel move to somewhat stronger ground in saying that Texas has consented to the priority of water use for irrigation in the Rio Grande Project, as certain statutes of Texas do point in that direction,[35] but still are not explicit enough to settle the question.

The plaintiff District has contracted an obligation and indebtedness to the United States of the kind described in

32. State of Wyoming v. State of Colorado, 259 U.S. 419, 466, 42 S.Ct. 552, 66 L.Ed. 999. State of Kansas v. State of Colorado, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956.

33. United States v. Gerlach Livestock Co., 339 U.S. 725, 70 S.Ct. 955, 94 L.Ed. 1231; State of Nebraska v. State of Wyoming, 325 U.S. 589, 612–615, 65 S.Ct. 1332, 89 L.Ed. 1815; State of Nebraska v. State of Wyoming, 295 U.S. 40, 43, 55 S.Ct. 568, 79 L.Ed. 1289; California Oregon Power Co. v. Beaver Portland Cement Co., 295 U.S. 142, 163–164, 55 S.Ct. 725, 79 L.Ed. 1356; Silas Mason Co. v. Tax Commission, 302 U.S. 186, 204–207, 58 S.Ct. 233, 82 L.Ed. 187.

34. Rank v. Krug, D.C., 90 F.Supp. 773, 799.

35. Revised Statutes of Texas 1925, Title 128, Vernon's Ann.Civ.St., contains two articles as follows:
"Art. 7587. When, in the examination of any such irrigation or reclamation project, under the provisions of the Act of Congress, known as The Reclamation

Act, approved June 17, 1902, it shall be found advisable or necessary to irrigate or reclaim lands within the limits of the State, the Secretary of the Department of the Interior is authorized to make all necessary examinations and surveys for, and to locate and construct irrigation or reclamation works within this State, and to perform any and all acts necessary to carry into effect the provisions, limitations, charges, terms and conditions of said Reclamation Act."
"Art. 7622. The County Commissioners' Court of any county in this State * * * may establish * * * Water Improvement Districts * * * in the manner hereinafter provided * * *. Such districts may be formed for cooperation with the United States under the Federal Reclamation Laws for the purpose of the construction of irrigation works, including drainage works, necessary to maintain the irrigability of the land for the purchase, extension, operation or maintenance of constructed works or for the assumption, as principal or guarantor, of indebtedness to the United States on account of district lands."

the last mentioned statutory article, and presumably the continuance of irrigation therein at the usual level is necessary for the orderly self-liquidation of the enterprise, so that any inroads in the name of a higher priority under the Texas law, which substantially depletes the water for irrigation in said District, might well hinder or disrupt the entire project.

The plaintiffs' position is not impaired by two statutory articles of Texas, one of which is strongly relied on by defendant, (certainly not if the second of such articles is constitutional), and same are quoted in the margin.[36]

The defendant's counsel strenuously argue that said Article 7472a is unconstitutional.[37]

■ In the first place, constitutional guaranties, ordinarily, at least, are not designed to protect one arm of the state from the body of the state, but are to protect individual and corporate citizens against the state, or arms of the state. This principle is recognized not only by the Supreme Court of the United States,[38] but also in Texas,[39] as well as other states,[40] and is stated in the standard texts.[41]

■ Laying that consideration aside, it is not evident at all that the statute reflects any arbitrary discrimination, or repugnant classification. It has been in the statute books now for twenty-four years. Of course, at this late date it would be difficult to reliably reconstruct the reasons which prompted its enactment, but a number of things, tending to bring the statute within the permissible discretion of the law-making body can be pointed out. The Rio Grande is the only international stream bordering on Texas, and since that brings into play interests and relations between nations, much of the control over the river and its waters must, necessarily, be left in the hands of the United States. The Republic of Mexico, as well as the United States, has interests at stake. The Rio Grande has been the subject of Conventions and

---

36. Revised Statutes of Texas 1925:
"Art. 7472. As between appropriators, the first in time is the first in right, provided, however, that all appropriations or allotments of water hereafter made for hydro-electric power, irrigation, manufacturing, mining, navigation, or any other purposes than domestic or municipal purposes, shall be granted subject to the right of any city, town or municipality of this State to make further appropriations of said water thereafter without the necessity of condemnation or paying therefor, for domestic and municipal purposes * * * any law to the contrary notwithstanding."
"Art. 7472a. The provisions of Section 2 of this Act (Art. 7472) shall not apply to any stream which constitutes or defines the International border or boundary between the United States of America and the Republic of Mexico."

37. "Article 7472a, which attempts to state that the public policy of the State of Texas, as set forth in Articles 7471 and 7472, giving municipalities the right to make further appropriations of water already appropriated is abrogated and is unconstitutional without question. There certainly is no difference in human beings in cities on the Rio Grande and those living elsewhere within the State upon

other streams. It is elementary that where the classification in a statute is without reasonable basis, the law is unconstitutional, * * *. In our judgment, it is unthinkable that a different rule of priority should apply to water from the Rio Grande River, or to people living on the Rio Grande River than to water taken from other rivers located in the State of Texas. Is there any difference between the people living on the Rio Grande River and those living on the Colorado River, the Trinity River, the Brazos River, or any other river in Texas? No reason is even hinted at by counsel for plaintiffs where there was any class difference which would justify this distinction."

38. City of Trenton v. State of New Jersey, 262 U.S. 182, 43 S.Ct. 534, 67 L.Ed. 937; City of Chicago v. Sturges, 222 U.S. 313, 32 S.Ct. 92, 56 L.Ed. 215.

39. City of Beaumont v. Gulf States Utilities Co., Tex.Civ.App., 163 S.W.2d 426.

40. State ex rel. v. Powers, 124 Tenn. 553, 137 S.W. 1110; Pederson v. City of Portland, 144 Or. 437, 24 P.2d 1031; Charles Hewitt & Sons Co. v. Keller, 223 Iowa 1372, 275 N.W. 94.

41. 16 C.J.S., Constitutional Law, § 300 et seq.

Treaties between these nations. It is seen in this lawsuit that a portion of the waters of the river, in the upper part of its boundary segment, have been allocated to Mexico and the United States is pledged to make delivery thereof at a point opposite the defendant City. The International Boundary Commission of the United States and Mexico is entrusted with a measure of continuing supervision and cooperation in questions and plans pertaining to the Rio Grande. In short, Texas does not and cannot have a free hand with this particular river. The welfare of the people living in the valleys along the Texas side of the Rio Grande may be more closely tied to an agricultural economy dependent so wholly on irrigation than along any other river of Texas. This is enough to suggest, not so much that the statute was well advised, but that, at least, it is not irrational. The article in question is held constitutional.

The strongest bulwark of the plaintiffs' suit, in the present respect, is the Rio Grande Compact between Colorado, New Mexico and Texas. The relevant articles have already been quoted in a preceding footnote. This Compact has a number of peculiar provisions. For example, the water New Mexico must pass to Texas is delivered not where the two States meet, but at San Marcial, New Mexico, more than 100 miles above the point where the Rio Grande leaves New Mexico. This delivery is made into the reservoir of the Elephant Butte Dam, the principal structure of the Rio Grande Project. Some of this water eventually goes to Mexico. The Compact, instead of leaving the Texas share of the water open for disposition under the general water statutes of Texas, plainly directs same for irrigation in the Project. A large part of the Project lands are in New Mexico and, consequently, this water delivered to Texas goes to irrigate not only Texas lands, but also New Mex-

ico lands in the Project. The apparent reason for all this is that when the Compact was negotiated, the Rio Grande Project, in all of its far flung works and physical properties was, and for some time had been, superimposed on the Rio Grande and its adjoining valleys all the way from the Elephant Butte Reservoir in New Mexico, to a point below Fabens in Texas and that fait accompli colored the whole Compact as between New Mexico and Texas. Perhaps the problem was handled in the only practicable way.

In any event, an analysis of the Compact shows convincingly that the water belonging to Texas is definitely committed to the service of the Rio Grande Project. This Compact is binding on Texas and the defendant City and, for that matter, is binding on the inhabitants and citizens of Texas.[42]

The Territory of New Mexico put in force the water appropriations made under its laws years ago for the intended use of the incipient Rio Grande Project, which, from the standpoint of New Mexico, meant more particularly what later became the Elephant Butte Irrigation District, and, naturally, New Mexico had no intention in the Compact that the water delivered at San Marcial should, in any event, all go downstream to Texas, with the result of leaving said local District waterless. Just as plainly, the United States never supposed that its physical works and facilities were to be put in service to handle that part of the water destined for Texas, only to have the Project lands deprived of it in favor of other uses under the law of Texas, thus, perhaps, imperiling the repayment program between the Project and the United States.

The defendant City insists, regardless of what else may be said, that it has a high statutory use for the waters of the river and is entitled to the first claim on same under still another article of the Statutes of Texas.[43] The defendant ar-

---

42. Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 82 L.Ed. 1202.

43. "Art. 7471. In the conservation and utilization of water declared the property of the State, the public welfare re-

gues that this contention is sound whether or not Article 7472a, mentioned above, is constitutional. Articles 7471, 7472 and 7472a are all derived from the same legislative Act and that helps in the proper construction thereof.[44]

The plan of the whole Act seems to make it reasonably clear that Article 7471 simply regulates priorities prospectively in the subsequent issuance of appropriation permits, so that in acting on pending applications from time to time or in holding foresighted reserves preference will be governed by this statutory guide, but said article does not manifest any intention to upset the normal time priority of then or thereafter outstanding permits once duly issued. This distinction is made clear in Article 7472, which states that "the first in time is the first in right", but further provides as the only exception that appropriations of water "hereafter made" for any of the other statutory purposes "shall be granted subject to the right of any city, town or municipality of this State to make further appropriations of said water thereafter without the necessity of condemnation or paying therefor, for domestic and municipal purposes as defined" in Article 7471. The defendant City, however, is in the class of municipalities denied the exceptional authority aforesaid by force of Article 7472a. In other words, the position of the defendant is not strengthened in this suit by the terms of Article 7471.

The defendant City presented record proof that acequias, an ancient thing along the Rio Grande, were still used in El Paso under town or city management to provide water for domestic and irrigation uses as late as near the turn of the century. On the other hand, it is also undisputed that the defendant City discontinued the use of river water for domestic and municipal purposes during all the time between dates in 1918 and 1943. The said acequias which served El Paso years ago brought water from the Rio Grande, but that hardly sustains any prescriptive or other present day right to the waters of the river. The acequia system of water supply, in its origins, evidently was appropriation in its simplest form. The river water was at hand, there was no hindrance, it was a necessity, and the early settlers simply helped themselves to satisfy common wants, just as they took the clay for making adobe. The question of whether any riparian aspect entered in during the years of the last century, when the acequias were still used in El Paso, is not definitely developed in the record. The record does show, however, that the original plat of the town of El Paso, made in 1858, located the townsite a half mile or more back from the river, but acequias are drawn in leading from the river into and across the townsite, and that spatial setting is, at least, consistent with the observation already made that the ancient acequias in the valley of the Rio Grande were works for a water use more akin to the appropriation practice than to riparian rights. Be that

quires not only the recognition of uses beneficial to the public well being, but requires as a constructive public policy, a declaration of priorities in the allotment and appropriation thereof; and it is hereby declared to be the public policy of the State and essential to the public welfare and for the benefit of the people that in the allotment and appropriation of the waters defined in Article 7467, * * * preference and priority be given to the following uses in the order named, to-wit:
"1. Domestic and Municipal uses, including water for sustaining human life and the life of domestic animals.

"2. Water to be used in processes designed to convert materials of a lower order of value into forms having greater usability and commercial value, and to include water necessary for the development of electric power by means other than hydro-electric.
"3. Irrigation.
"4. Mining and recovery of minerals.
"5. Hydro-electric power.
"6. Navigation.
"7. Recreation and pleasure."

44. Acts of the 42nd Legislature, General Laws, Regular Session, Chapter 128, page 217. (1931)

as it may, said acequia history, so far as is seen, does not aid the defendant City.

The above discussion of the different claims of the defendant City comes to the conclusion that all of the appropriative water rights advanced by the City are either without reality or else must yield to the paramount disposition made by the Rio Grande Compact. The question whether there still might be some possible contingencies when the City would be entitled to appropriate waters of the Rio Grande will be reached at another place.

The other point, with present bearing, made by the City, is that of riparian rights. The two questions to settle at the outset are (1) what are riparian lands and (2) what are riparian waters. The Court in Richter v. Granite Mfg. Co., 107 Tex. 58, 174 S.W. 284, 286, L.R.A.1916A, 504, quotes from a text book, as follows:

" 'All riparian rights depend upon the ownership of land which is contiguous to, and touches upon, the water; * * *. They do not attach to any lands, however near, which do not extend to the water; * * *.' "

In Motl v. Boyd, 116 Tex. 82, 286 S.W. 458, 468, the Court says:

"We are of the opinion that riparian waters are the waters of the ordinary flow and underflow of the stream, and that the waters of the stream, when they rise above the line of highest ordinary flow, are to be regarded as flood waters or waters to which riparian rights do not attach. * * * 'The line of highest ordinary flow' is the highest line of flow which the stream reaches and maintains for a sufficient length of time to become characteristic when its waters are in their ordinary, normal, and usual condition, uninfluenced by recent rainfall or surface run-off."

This declaration contracts the common law description of riparian waters. The quantitative measure of riparian waters, however, is not so important at this time as the limits to the uses of water by a riparian. The statement in Texas usually includes domestic, livestock and reasonable irrigation as proper riparian uses, and those are the more familiar uses, but that is not literally an exclusive enumeration. The question here is whether a large city, owning some riparian land, can bring a municipal water supply within the riparian rights fold.

The defendant City, in its proprietary capacity, owns a few hundred acres of land riparian to the river, and the principal tract thereof is being used as a drilling site, where a number of water wells produce a part of the water supply for domestic and municipal purposes in El Paso. Another of its riparian tracts is a tract used as the site of a water treating plant. A Texas court has held that the city in that suit, a riparian owner, was entitled under the special circumstances, to take water it had impounded and supply it to the people of the city, in preference to use by riparian owners for irrigation, but the city had acquired its tracts from certain riparian owners, who knew the specific purpose of the city was to impound a municipal water supply, as reflected by the deed, and a later contract about their correlative water rights had been made between the city and one of the defendants together with predecessors in title of the other defendants, and against that background the court held the City's right superior to that of the defendants.[45] That decision, however sound in the light of the peculiar facts, might well be compared with a later case.[46]

Neither of the two cases just mentioned reflect any broad rule on the subject which would be controlling in this suit. The general rule is that the riparian rights of a city, owning land

---

45. Grogan v. City of Brownwood, Tex.Civ. App., 214 S.W. 532, 537.

46. City of Wichita Falls v. Bruner, Tex. Civ.App., 165 S.W.2d 480. (Writ refused)

along a river, are no different from the rights of an individual owner, and cannot be expanded to justify the use of such rights as a nucleus for supplying and selling water in great quantities to the general public in said municipality, including mainly residents of non-riparian lands.[47] The law of riparian rights is allied peculiarly with the interests of natural persons as owners of riparian lands, a particular advantage to those owning land with water frontage and the requirement that such lands must hug the stream well serves to stabilize the valuable benefits. A dominant distinction between riparian rights and appropriation rights is the principle of equality among riparians in contrast to the principle of time priority among appropriators. One of the tabulations in evidence shows that, over the last nine years, the City's take of river water has mounted. The average annual take for the three years beginning with 1946 averaged a little over 6,000 acre-feet. The average annual take for the next three years, beginning with 1949, was about 7,500 acre-feet. For the final three years, beginning with 1952 (the last 4 months of 1954 being estimated), the take averaged over 9,000 acre-feet. Of course, in that time the City had made long strides in growth. That amount of water equals only a small percentage of the total quantity going to the territory of the Rio Grande Project, but in most relations would be regarded as a large volume, and particularly in the ordinary riparian relationship. Such a withdrawal prima facie would seem to be out of focus with the principle of riparian equality. Many times the amount of riparian land owned by the City is owned by divers and sundry other proprietors in Texas along the river within the Rio Grande Project. This makes it manifest that the problem raised by the City is inseparably linked with the Project, if indeed the claim can have any footing in the face of the Rio Grande Compact.

The bearing of the Compact on *either the appropriation or the riparian* rights claimed by the City raises a federal question,[48] and has been decided herein with respect to the first of such rights, but need not be determined with respect to the second thereof.

Another important distinction between riparian rights and appropriation rights is that the riparian's use measure of water is elusive and shrouded in the word "reasonable", more unknown than foreknown, while the appropriator's use measure of water is predetermined, at least the maximum. The City's riparian claim might, for the moment, be regarded as sound theoretically, but at once there would come the baffling puzzle of evaluation and fitting it into the mosaic of the El Paso Valley. The present record, at least, seems unequal to such an intricate task. The only possible out in sight would have to be immersed in generalities, instead of being charted by any definite formula. That point is not reached, however, since the great weight of authority agrees that the pattern of riparian rights was never cut to fit the public water requirements of a large municipality.

Franklin Canal.

In July 1889, one Loomis and five others acting under an "Act to Encourage Irrigation", enacted in 1889, the first such general statute of Texas, executed a written declaration appropriating out of the unappropriated waters of the Rio Grande a quantity equal to 333 cubic feet per second, which would be diverted through a projected canal 40 feet wide

47. Pernell v. City of Henderson, 220 N.C. 79, 16 S.E.2d 449; Stein v. Burden, 24 Ala. 130, 60 Am.Dec. 453; City of Emporia v. Soden, 25 Kan. 588, 37 Am.Rep. 265; Town of Purcellville v. Potts, 179 Va. 514, 19 S.E.2d 700, 141 A.L.R. 633; Haupt's Appeal, 125 Pa. 211, 17 A. 436, 3 L.R.A. 536; Lord v. Meadville

Water Co., 135 Pa. 122, 19 A. 1007, 8 L.R.A. 202, 20 Am.St.Rep. 864; Ferguson v. Village of Hamburg, 272 N.Y. 234, 5 N.E.2d 801.

48. Delaware River Joint Toll Bridge Commission v. Colburn, 310 U.S. 419, 427, 60 S.Ct. 1039, 84 L.Ed. 1287.

and 3 feet deep, named the "El Paso Irrigation Canal", to be laid out from a head gate on the river, through the town of El Paso along Eighth Street and thence southeasterly with the general course of the river to Fabens, and the recited purpose was to carry such water "for irrigation and domestic use, and for mining, milling and stock raising", by all persons entitled thereto along the line of said canal. The El Paso Irrigation Company, assignee of Loomis and associates, was granted a franchise and right of way 50 feet in width under an ordinance of the City of El Paso, effective July 6, 1889, for a term of 50 years, to construct and maintain the aforesaid canal for irrigation purposes through said city, subject to prescribed rates, and any discrimination against customers in the city was prohibited. In 1912, the United States, acting under the Reclamation Act,[49] of the United States, by mesne conveyance, and for a consideration of $120,000, acquired the canal aforesaid, which in the meantime had become named the "Franklin Canal", together with rights of way, easements, irrigation facilities and structures, and other appurtenant interests and property. In 1905 Congress extended the Reclamation Act to include that part of Texas known as "The El Paso Valley" along the Rio Grande, and at the same time authorized the construction of the Elephant Butte Dam on the Rio Grande in New Mexico, to get under way with the Rio Grande Project.[50] Of course, the development took many years. The said canal and appurtenances were acquired, as aforesaid, in the progress of that project. In 1913, the City of El Paso amended the franchise ordinance of 1889 by naming the United States of America as the assignee and successor of the El Paso Irrigation Company, and reducing the width of the right of way on Eighth Street (which is 70 feet wide as platted) from 50 feet to 25 feet and regulatory

provisions, appropriate to the original ordinance in its nature as a franchise, were deleted.

The City Council of El Paso on November 9, 1939, passed and approved an ordinance entitled as follows:

"An ordinance amending an ordinance entitled: 'An ordinance conveying unto the United States of America all the right, title and interest of the City of El Paso in and to the right of way occupied by the Franklin Canal from, along, and across the streets, alleys and other public lands of the City of El Paso, with certain reservations and providing for a reverter when the said right of way is no longer used for canal purposes, and declaring an emergency', by inserting therein the clause 'contingent, however, upon appropriations being made therefor by Congress', and declaring an emergency."

A quitclaim deed dated November 9, 1939, was executed by the City of El Paso to the United States of America pursuant to the aforesaid ordinance and The Reclamation Law of the United States. The defendant City now contends that said ordinance and quitclaim deed are both null and void, on the grounds that same were ultra vires, whether tested by its charter, the statutes or the constitution, without consideration and outside the purview of Article 5244a of the Revised Civil Statutes of Texas, Vernon's Ann.Civ.St. This charter forms a special law of March 2, 1889, entitled "An Act to Incorporate the City of El Paso", enacted by the Legislature of Texas. The City's defense of ultra vires turns on the question whether it was without any power to do the act attempted by the ordinance and quitclaim deed in question. The material parts of the pertinent sections in the charter are noted below as a footnote.[51]

49. Act June 17, 1902, C. 1093, 32 Stat. 388, 43 U.S.C.A. § 371 et seq.

50. Act February 25, 1905, 33 Stat. 814,

51. "Section 1. That all the inhabitants of the City of El Paso, in El Paso County, Texas, * * * shall constitute and

The charter provisions just noticed amply show that the defendant City had the essential powers to do what was done in this disputed transaction, subject to the condition that same is supported by a proper consideration. This comes to the element of consideration. The defendant City throughout its growth and particularly in the most rapid stage thereof, during the last twenty years, has drawn much support from its tributary agricultural economy, and that, in turn, has come to full development under the program of the Rio Grande Project. This factor is expressly recognized in the very words of the subject ordinance.[52]

This was a legitimate inducement to the defendant City in keeping with the decision evidenced by said ordinance and within the spirit of the terms of its charter.[53]

The said canal was virtually unfenced at the time the ordinance was enacted in 1939, and as a part of the transaction it was the intent of the parties that the plaintiff Government would have the right of way fenced without expense to the City, and that feature of the agreement prompted a reference contained in Section 2 of the ordinance.[54]

In compliance with such understanding the Government spent, or caused to

---

continue to be a body politic and corporate by the name and style of the City of El Paso, * * * they shall be known by the same name in law and thereunder shall be capable * * * of contracting and being contracted with; * * *."

"Section 2. The City of El Paso shall have power * * * to enact and enforce any and all ordinances upon any subject; * * * it being intended by this act to grant to and bestow upon the inhabitants of the City of El Paso full power of self-government, and it shall have and exercise all powers of municipal government not prohibited to it by this charter or by some general law of the State of Texas, or by the provisions of the constitution of the State of Texas."

"Section 37. No railroad company, * * * nor company of any kind, nor person, nor corporation, shall ever occupy or use the streets or public places of the City of El Paso for any purpose whatsoever without first obtaining the consent of the City Council evidenced by the ordinance duly enacted and no mere acquiescence or other act or omission of the City Council or city officers shall be held to confer by estoppel or indirection any such rights * * *."

"Section 56. The City Council shall have complete and exclusive control and power over the streets, alleys and highways of the City and * * * to * * * close, * * *, sell, lease, * * * said streets; provided, no street shall ever be closed, sold or leased except for an adequate consideration, and not then except by a vote of at least three-fourths of the aldermen and the approval of the Mayor; * * *."

52. The ordinance passed and approved

November 9, 1939, in Section 1, as therein amended, recites as follows:

"Section 1. In consideration of the very great benefits conferred upon the city and county of El Paso and all of the residents thereof by the maintenance and operation of the Rio Grande Reclamation Project, furnishing water for the irrigation of land in the city and county of El Paso, and the further consideration that the maintenance and operation of what is known as the "Franklin Irrigation Canal" is indispensable to the carriage and distribution of said waters for irrigation purposes, * * *."

53. "Section 120. The City Council shall have power to pass, publish or amend or repeal all ordinances, rules and police regulations not contrary to the constitution of this State, for the good government, peace and order of the city and the trade and commerce thereof that may be necessary or proper to carry into effect the powers vested by this act in the city government or any department or officer thereof; * * *."

54. The reference in question reads as follows:

"Section 2. The fact that it is immediately necessary to commence work on fencing the right of way of the Franklin Canal as a measure of public safety and that this work is awaiting the vesting of title in the United States of America to the right of way aforesaid, creates a great public emergency justifying the suspension of the rule", requiring that ordinances shall not be finally adopted until same are read at two regular meetings of the City Council.

be spent, some $56,000 for such fencing with reasonable promptness after the parties closed said transaction. The result so gained by the City served its public responsibility under the charter.[55]

Thus it is seen that the defendant City recognized two material and substantial elements of consideration in the transaction under discussion, and, moreover, the facts make it evident that this transaction fulfilled the consideration requirement of the defendant's charter.

The defendant City also apparently contends that the ordinance and attendant quitclaim deed aforesaid undertook to create a species of rights and privileges in the nature of a franchise, without conforming to the procedural requirements of the charter.[56]

The record does not show that the ordinance in question was published as directed in Section 36 of the defendant's charter. Of course, if the subject matter of said ordinance did not constitute a "franchise", then there was no requirement of publication, and if it is assumed that same was not published, the most natural explanation would be that the parties believed they were not dealing with a franchise.

One of the most satisfactory definitions of a franchise is found in State of California v. Central Pac. R. Co., 127 U.S. 1, 8 S.Ct. 1073, 1080, 32 L.Ed. 150, as follows:

"Generalized, and devested of the special form which it assumes under a monarchial government based on feudal traditions, a franchise is a right, privilege, or power, of public concern, which ought not to be exercised by private individuals at their mere will and pleasure, but should be reserved for public control and administration, either by the government directly, or by public agents, acting under such conditions and regulations as the government may impose in the public interest, and for the public security."

The Supreme Court of Texas in T. & P. Ry. Co. v. City of El Paso, 126 Tex. 86, 85 S.W.2d 245, 249, discusses the subject as follows:

"There exists a clear distinction between a franchise and an easement. The grant of a franchise does not carry with it an interest in land. It is a privilege which may be granted and acquired without involving the ownership of land. On

---

55. The pertinent part of the charter is as follows:

"Section 2. The City of El Paso shall have power to enact and to enforce all ordinances necessary to protect health, life and property, * * * and to preserve and enforce the good government, order and security of the city and its inhabitants; to protect the lives, health and property of the inhabitants of said City."

56. The material parts of the two pertinent sections of the defendant's charter are as follows:

"Section 35. The right of control, easement, user and the ownership of and title to the streets, highways, public thoroughfares and property of the City of El Paso, its avenues, parks, bridges and all other public places and property are hereby declared to be inalienable, except by ordinances duly passed by a

vote of three-fourths of all members of the Board of Aldermen and approved by the Mayor; * * *."

"Section 36. Whenever application is made to the City Council of the City of El Paso for any grant or franchise, lease or right to use the streets, public highways, thoroughfares or public property of the City of El Paso, as provided for in the preceding Section of this Act, before such ordinance or franchise is introduced in the City Council, it shall be published in full in some daily newspaper published in the City of El Paso twice, the first publication being made at least one week before same is introduced in the City Council. When the same has been passed on its first reading, it shall be laid over for at least one week and published in full one time as finally proposed to be passed."

the other hand, an easement is essentially an interest in land. It is a dominant estate imposed upon a servient estate. The privilege of using the streets for railway purposes is a franchise. The actual occupation of the streets for railroad purposes by virtue of ordinances is an easement."

Other Texas cases on the point are noted in the margin.[57]

It should be kept in mind that the plaintiff Government in dealing with the defendant City to renew the right of way of the Franklin Canal was acting in the interest and right of the plaintiff District, since the Government was somewhat in the position of a temporary caretaker, as under the law the ownership of the works and facilities identified with the Rio Grande Project will ultimately go to the constituent Districts when the Government's outlays of money have been reimbursed, and at the present rate of repayment the plaintiff District should become the clear and absolute owner of all the facilities and properties identified with said project and located in such District, and more particularly the Franklin Canal, about the year 1968.

The plaintiff District was established in 1917 under the authority of a Texas Statute.[58] Later it was converted into a conservation and reclamation district under the Constitution of Texas, Vernon's Ann.St.Const. Tex. art. 16, § 59, but without any change of name. Under the statute it has a broad right of eminent domain "and the authority hereby conferred shall authorize and empower such districts to condemn all lands, private and public, for the purpose herein indicated, beyond the boundary of such districts and in any county within the State of Texas", and it also has the power of taxation. In fact, such districts and various other similar districts are not classed with municipal corporations, but are held to be political subdivisions of the State, performing governmental functions, and standing upon the same footing as counties and other political subdivisions established by law.[59]

It is not only an arm of the State, but is fashioned to perform public service and duties of high importance in the welfare of the people of Texas. It is inconceivable to think that the right of way of the Franklin Canal in El Paso, maintained for the public purposes of the plaintiff District, depends for its stability strictly on the will of a technical franchise, as between the District and the City. A franchise distinctively relates to special privileges in the use of public streets, ways and property by private corporations or persons engaged in rendering a service to the general public at a price intended to cover costs and leave a profit. The plaintiff District simply cannot fit that mold. It may be relatively infrequent, but there is nothing singular about one governmental subdivision having a street easement in another political subdivision.[60]

The only thing that could be unique about it is to call the arrangement a "franchise". Even where the two interested parties are a municipality and a private corporation, the mere right of the company to use and occupy parts of the public streets and other ways in the city for a business purpose is not at all necessarily a franchise.[61]

57. City of Wichita Falls v. Kemp Hotel Operating Co., Tex.Civ.App., 162 S.W.2d 150; McCutcheon v. Wozencraft, Tex. Civ.App., 230 S.W. 733.

58. Acts of 35th Legislature, General Laws, 1917; Chapter 87, § 77, Regular Session.

59. Willacy County Water Control & Imp. Dist. No. 1 v. Abendroth, 142 Tex. 320, 177 S.W.2d 936; Bexar-Medina-Atascosa

Counties Water Imp. Dist. No. 1 v. State, Tex.Civ.App., 21 S.W.2d 747.

60. City of Berwyn v. Berglund, 255 Ill. 498, 99 N.E. 705.

61. Washington Fruit & Produce Co. v. City of Yakima, 3 Wash.2d 152, 100 P. 2d 8, 103 P.2d 1106, 128 A.L.R. 159; Northern States Power Co. v. City of Granite Falls, 186 Minn. 209, 242 N.W. 714; Griffin v. Oklahoma Natural Gas

The defendant City under its charter has plenary authority and power over the streets and other public ways within the municipality. That is not to say, that the City owns the fee simple title to such streets and public ways. The Eighth Street previously mentioned was first laid out in the plat of Campbell's Addition to El Paso filed in 1887. The familiar general rule is that the abutting property owners own the legal title to the land occupied by a municipal street, subject to the public right and easement to use the property for street purposes and such public right and easement is held for the benefit of the public by the municipality. The record does not disclose any deviation from this general rule in connection with the dedication of said addition. The City still had plenary control, power and disposition of the public user rights and easements in the said street, even without any full proprietary ownership. The law is well settled in Texas that a municipality holding the estate in streets, as aforesaid, for the public cannot surrender or release such public interest therein solely for private uses and benefits,[62] but it is equally well settled that a municipality with such plen-

ary authority over its streets and public ways may relinquish the public rights and easements therein and close a street or other public way in furtherance of a legitimate public purpose and benefit,[63] and such action has been done by a deed relinquishing the public easement in the street even without the formality of either an ordinance or resolution closing such street.[64] Of course, the defendant City could not destroy any vested rights of abutting property owners along Eighth Street, if indeed they could now have any enforceable rights after the more than sixty years of acquiescence in the location, maintenance and use of said canal and, besides, that question is not in this suit, as such land owners are not parties, but at least the defendant City was competent to relinquish and quitclaim the canal right of way to the extent of its right, interests and easements as custodian for the public in its capacity as a municipality.

Another source of authority to sustain the City's ordinance and quitclaim deed, here in question, is found in a statute of Texas, now compiled as Article 5244a, Vernon's Texas Civil Statutes, and the material part thereof is quoted in the margin.[65] An appellate court of Texas

Corp., 10 Cir., 37 F.2d 545; City of Des Moines v. Welsbach Street Lighting Co., 8 Cir., 188 F. 906.

62. Jacobs v. City of Denison, Tex.Civ. App., 251 S.W.2d 804; Elston v. City of Panhandle, Tex.Civ.App., 46 S.W.2d 420; Industrial Co. v. Tompkins, Tex.Civ.App., 27 S.W.2d 343, (Writ refused); Malott v. City of Brownsville, Tex.Civ.App., 292 S.W. 606; Gambrell v. Chalk Hill Theatre Co., Tex.Civ.App., 205 S.W.2d 126; Texas Co. v. Texarkana Machine Shops, Tex.Civ.App., 1 S.W.2d 928.

63. Kahn v. City of Houston, 121 Tex. 293, 48 S.W.2d 595; Johnson v. Lancaster, Tex.Civ.App., 266 S.W. 565; Burrow v. Davis, Tex.Civ.App., 226 S.W.2d 199; Broussard v. L. Cartwright Realty Co., Tex.Civ.App., 179 S.W.2d 777; Malott v. City of Brownsville, Tex.Civ.App., 292 S.W. 606; Hartwell Iron Works v. Missouri-Kansas-Texas R. Co., Tex.Civ. App., 56 S.W.2d 922; Eidelbach v. Davis, Tex.Civ.App., 99 S.W.2d 1067.

64. Blair v. Astin, Tex.Civ.App., 10 S.W. 2d 1054 (Writ refused).

65. "When any County one or more of the boundaries of which is coincident with any part of the International Boundary between the United States and Mexico, * * * and when any City *, * * which may be located within any County of such described class, may be the owner of any property, land, or interest in land desired by the United States of America to enable any department or establishment thereof to carry out the provisions of any Act of Congress in aid of navigation, flood control, or improvement of water courses, * * * any such * * * City * * is hereby authorized and empowered, upon request by the United States through its proper officers for conveyance of title or easement to any part of such property, land, or interest in land, which may be necessary for the construction, operation, and maintenance of such works, to convey the same with or without monetary

**916**

has held that this statute supports the authority of the defendant City to execute the very quitclaim deed now in question.[66]

It is also noteworthy that the defendant City, in that suit, relied on the validity of the ordinance and quitclaim deed in question as a defense against liability for damages from the drowning death of a boy at a bridge across the Franklin Canal.[67]

██ The conclusion is reached that defendant City was duly authorized, not only under its charter, but also the additional statute last mentioned, to enact the ordinance and execute the quitclaim deed pertaining to the right of way of the Franklin Canal through El Paso, and this seems so well founded that the discussion might well rest at this point, but will be continued very briefly to touch on one other question mentioned by counsel in their briefs.

██ The remaining issue of estoppel will not be pursued with any broad analysis of the subject, but it is sufficient to say that under the general rule, as recognized in Texas, also in most other states, the defendant City, under the circumstances herein reviewed, would be held estopped to question the validity of the ordinance and quitclaim deed in question.[68]

### Bridges

This subject harks back again to the Franklin Canal. One of the predecessors in title, through whom by mesne transfers the Government acquired said canal, was the El Paso Irrigation Company. An ordinance of the defendant City, dated September 16, 1889, granted a franchise with a term of fifty years to said company for the construction, maintenance and operation of the canal through the City. The franchise included the requirement that the Company must "maintain bridges at such points as the Council shall require" over the canal. Then, after succession of title to the Government in 1912, the aforesaid ordinance was amended by another ordinance, dated December 11, 1913, which ran to "the United States of America assignee and successor of the El Paso Irrigation Company", and, after making some rather minor changes in the right of way of the canal, continued with a proviso that the Government was bound

consideration therefor to the United States of America, * * *."

66. City of El Paso v. Mendoza, Tex.Civ. App., 191 S.W.2d 102.

67. The answer of the defendant City in that tort suit contains a plea as follows: "Further answering, if need be, and not waiving the foregoing general denial, defendant says that long prior to the acts complained of in plaintiff's petition, defendant conveyed to the United States certain lands, including the bridge described in plaintiff's petition, * * * that said conveyance was executed by authority of an ordinance duly passed by the City Council of the City of El Paso and approved by the Mayor, * * *, that title to and possession and control of said lands, and particularly said bridge, are, and have been since the execution and delivery of said deed, in the United States of America; that defendant * * * has no right or power, to maintain or repair said bridge or perform any acts in connection therewith; that the acts complained of in plaintiff's petition, * * * were not

the acts of this defendant but of the United States, * * * and this defendant had * * * no responsibility therefor."

68. Krause v. City of El Paso, 101 Tex. 211, 106 S.W. 121, 14 L.R.A.,N.S., 582, 130 Am.St.Rep. 831; City of Port Arthur v. Young, Tex.Civ.App., 37 S.W.2d 383 (Writ refused); Corpus Christi v. Johnson, Tex.Civ.App., 54 S.W.2d 865; Sutor v. I. & G. N. R. Co., 59 Tex.Civ. App. 73, 125 S.W. 943 (Writ refused); B. F. Goodrich Rubber Co. v. Collinsville, Tex.Civ.App., 101 S.W.2d 583; People ex rel. Beardsley v. Rock Island, 215 Ill. 488, 74 N.E. 437; City of St. Joseph v. St. Joseph Terminal R. Co., 268 Mo. 47, 186 S.W. 1080; Blennerhassett v. Forest City, 117 Iowa 680, 91 N.W. 1044; State ex rel. Cox v. McIlravy, 105 Neb. 651, 181 N.W. 554; City of El Paso v. Hoagland, 224 Ill. 263, 79 N.E. 658; Boise City v. Wilkinson, 16 Idaho 150, 102 P. 148; Sioux City v. Chicago & N. W. R. Co., 129 Iowa 694, 106 N.W. 183.

to "construct, erect and maintain bridges" at certain street crossings over the canal, being 9 concrete bridges, some 70 feet wide and some 32 feet wide, and 2 steel or concrete bridges, one 32 feet wide and the other 20 feet wide, and 2 steel bridges, both 24 feet wide; "and shall erect and maintain and replace all bridges east of Cotton Avenue with steel or concrete bridges to be 20 feet wide, and bridges on such other streets as the Council may require."

The preceding background brings attention next to the quitclaim deed of November 9, 1939, from the defendant City to the Government, and the attendant ordinance, both already mentioned in this opinion. The quitclaim deed redescribes the right of way of the canal, suited to the later perimeter of the City, and enumerates the location of some 31 bridges crossing the canal "heretofore constructed by the Bureau of Reclamation of the United States", and then recites: "this conveyance is subject to the condition that the United States shall be obligated to maintain the said bridges at the said described crossings contingent, however, upon appropriations being made therefor by Congress; and there is further reserved to the said City of El Paso the right to construct and maintain at its own cost and expense such additional bridges and other structures across said canal other than those hereinabove designated as it may deem necessary." Twelve of the thirteen bridges called for in the amending ordinance of December 11, 1913, are among the 31 bridge locations specified in the quitclaim deed last named.

■ The last quoted recital has provoked one of the disputes herein between the parties. The Government contends for the narrower and the City for the broader meaning of "maintain". The Government clearly is under no obligation to either build or maintain bridges at any except the 31 locations specified in the quitclaim deed.[69] The Government, just as clearly, is bound to maintain the bridges at such named locations. The word "maintain" when directed to the subject of some structure, ordinarily means to keep it in repair and in virtually the same serviceable state. At the same time, the word should not be made a prisoner of any straight-jacket out of the dictionary. In contracts words are not detached abstractions and must take color from the subject matter and the object in mind. The requirement that the Government should maintain the bridges in question was made to keep, without expense to the City, a necessary link in service at the different canal crossings of the several public streets for the use of vehicular and foot traffic in the City. There is nothing in the writing to suggest any expectation of the parties that the City would ever have to take over the construction or maintenance of a bridge at any of the designated points, so long as the Government or the District continues the use of the canal. In fact, the City had consistently striven in 1889, and in 1931 and in 1939, as above related, to charge the owner of the canal with the duty and expense of maintaining bridges at street crossings over the canal, and in none of the transactions is there any inkling of a contingency which would shift such responsibility to the City, except in the event that use of the canal was abandoned.

■ The purpose of the use of a public facility, like a bridge, is to serve a continuing and often a growing public demand, a necessity of indefinite duration. If some vandal should blow up one of the bridges in question that would not end the public need for passage over the canal. When the structure and the use are brought into focus, there is little doubt that the duty to maintain such a bridge is imperative enough that it would not be canceled even by destruc-

---

69. City of Indianapolis v. Indianapolis Water Co., 185 Ind. 277, 113 N.E. 369; Hidalgo County Water Control & Imp. Dist. No. 1 v. Hidalgo County, Tex.Civ. App., 134 S.W.2d 464.

tion of any given bridge.[70] That conclusion leaves only a short stride to say further that the duty to maintain the bridges in question also demands that said bridges be kept adequate for the needs of common traffic, even if it is necessary to widen, lengthen or reenforce any such bridge to keep pace with a growing traffic load.[71] It is significant that the amending ordinance of December 11, 1913, aforesaid, specifies varying widths for the 13 respective bridges mentioned therein, obviously actuated by an awareness of the differing traffic densities and needs as between the various bridges, and this circumstance points up the fact that the parties were not thinking in terms of any dead monotony of bridge maintenance, but had an eye to meet the varying public need. This is enough to indicate that more than a mere routine of repairs and upkeep lies within the perspective of "maintain", when it is appraised in the sense of said quitclaim deed. The Government's covenant to maintain bridges does not have the aspect of a static liability, confined simply to keeping the existing bridges unchanged, but looked at in the context of the attendant transactions, the undertaking to maintain must be read in reasonable furtherance of the function of such bridges. From that standpoint it is only reasonable to say that the Government has bound itself to do any and all reasonable rebuilding, restoration, enlargement, reenforcement, and repairs, which may be required to keep at the specified crossings bridges suitable and adequate to serve the public traffic needs at each of said locations, as same may vary with settled shifts in traffic density during the years, and such is the holding of the court.

The aforesaid liability of the Government is contingent upon appropriation of the necessary money by Congress, but plaintiff District, concurrently with the quitclaim deed of November 9, 1939, and auxiliary to that transaction, duly assumed the secondary liability in favor of the defendant City to pay for the maintenance of bridges at the foregoing several locations, whenever the necessary funds are not appropriated by Congress or provided by the Government or its agencies.

## Water Supply Contracts

Under date of February 18, 1941, a contract was executed between the United States of America, the City of El Paso, and the El Paso County Water Improvement District No. 1, and, subsequently, under date of December 1, 1944, a contract was executed between the same parties, and, additionally, the Elephant Butte Irrigation District. The objective of each contract was to furnish a supplemental supply of water for municipal purposes to the defendant City, but within the ambit of the Reclamation Act. Both contracts remain in force, with the qualification, as stated in the second contract, that "It is understood that this contract is amendatory to the El Paso District contract, which shall not be affected by the provisions hereof, except as the same may, by the provisions hereof, be expressly modified." The present enquiry does not touch any of the divergences therein, but goes to terms covered in substantially parallel provisions of the respective contracts.

70. State ex rel. Boddenhagen v. Chicago, M. & St. P. Ry. Co., 164 Wis. 304, 159 N.W. 919; Tennessee Electric Power Co. v. White County, 6 Cir., 53 F.2d 1065, 1066; People ex rel. Keene v. Board of Supervisors, 142 N.Y. 271, 36 N.E. 1062, 1063; Louisville & N. R. Co. v. United States Iron Co., 118 Tenn. 194, 101 S.W. 414, 419.

71. State v. Lehigh Valley R. Co., 89 N.J.L. 48, 97 A. 786, affirmed 90 N.J.L. 340, 100 A. 167; Commonwealth v. Inhabitants of Deerfield, 6 Allen, Mass., 449; Davis Holding Corp. v. Wilcox, 112 Conn. 543, 153 A. 169; Plimpton v. New York, N. H. & H. R. Co., 221 Mass. 548, 109 N.E. 732, 733; McCutchen v. City of Siloam Springs, 185 Ark. 846, 49 S.W.2d 1037; Rhodes v. Mummery, 48 Ind. 216, 218; State ex rel. City of Olympia v. Olympia Light & Power Co., 91 Wash. 519, 158 P. 85, 89.

The inducement recital, from the standpoint of the City, identical in each contract, is quoted in the margin.[72] The special feature in contractual mechanics was a provision for the City to acquire water right lands within the Rio Grande Project, but not to exceed 2,000 acres in either of the two Districts, in keeping with its "desires to receive each year from the Project water supply an amount of water not to exceed the amount of water which such acquired lands would be entitled to receive from said water supply for the respective year, if held in private ownership of qualified Project landowners, which will in no event be in excess of three and one-half (3½) acre-feet of water a year for each acre of such acquired land." Other provisions deal with the facilities the City will provide for receiving delivery of water, the charges and terms of payments to be made by the City, and many other particulars about the performance of such contracts. In particular a further and somewhat novel provision singled out for attack by the City is quoted below from the second contract.[73]

On its part the City made ready to put said contracts in motion by acquiring numerous scattered tracts of water right lands, aggregating about 1,400 acres within the Project territory, and built a water treatment plant as its chief facility for use in receiving delivery of the water. The parties herein carried on

72. "Whereas, the City which now owns and operates a municipal water system, including deep wells, reservoirs and distribution works, needs and desires to procure from the Project water supply a supplemental water supply to meet the present and anticipated future needs of the City and its inhabitants; and there is available to the City no practicable source of such supplemental water supply other than the said Project water supply;"

73. "9. (a) Before delivery of water to the City as provided in Article 8 hereof * * * the City's Superintendent shall deliver to the Managers of the respective Districts

"(1) Evidence of the City's ownership of acquired lands within said affected District.

"(2) Powers of attorney duly executed on behalf of the City authorizing each, the Elephant Butte District and the El Paso District, as attorneys in fact for the City to offer for sale and sell and convey to the highest bidder, who shall be a qualified landowner, for cash at public auction after notice of such sale, published once a week for three (3) consecutive weeks, each in a newspaper of general circulation in said Districts, any of said lands held by the City in either of said respective Districts after the expiration of ninety (90) days from the effective date of the termination of the City's right to receive water under the provisions of this agreement as provided for in Article 11 hereof. Such powers of attorney shall continue in force from the date of their delivery until the expiration of one year from and after the effective date of such termination of the City's right to receive water; Provided: That notwithstanding such powers of attorney, the City may at any time prior to the date of termination of the City's right to receive water hereunder, convey unconditionally any of the acquired lands within either of said districts to qualified landowners without the execution of additional instruments by either of said Districts for the release of said District's respective power of attorney."

(The first contract in question contains a similar provision, but worded to fit the circumstance that only one of the two Districts was a party to that contract.)

* * * * *

"(c) The proceeds from the sale of any land made under the powers of attorney provided for in this article shall be applied first to pay the reasonable costs of conducting such sale and next to the payment to the said District in which such lands are located of any amount at the time of such sale remaining due and unpaid to such District pursuant to this contract, and any amount of such proceeds thereafter remaining shall be paid to the City."

"(d) Upon the termination of the City's right to receive water under the provisions of this agreement, the City shall offer for sale and endeavor to sell and convey any acquired lands then held by the City to qualified landowners."

* * * * *

agreeably under these contracts for about ten years, with a regular routine of water deliveries by plaintiffs and payments therefor by the defendant, but in 1951 new City officials, recently elected, began challenging such contracts, as well as other past transactions between the parties, until the points of controversy matured into this law suit.

The defendant City argues that the above contracts are invalid, as the Secretary of the Interior had no authority to so bind the United States, and that same were ultra vires of the City, and that same were without consideration. Counsel for the Government counter all said points of attack against the contracts. In the first place, the pivot of the question about the authority of the Secretary of the Interior is that the contracts in question infringe the 160 acres restriction in the Reclamation Act.[74]

It may be pointed out that said statute refers to land "in private ownership", while any land bought by the City under these contracts would be held in public ownership, and, moreover, the statutory language refers to watered land and the land of the City would not fit that description. Other statutes in pari materia have been cited by counsel,[75] but the self-sufficient source of explicit authority for the Secretary of the Interior in the execution of the aforesaid contracts is found in still another statute.[76]

The defendant turns the last proviso of the statute in footnote **76** against the validity of the contracts by saying that such contracts obviously were "detrimental to the water service for such irrigation project", but the short answer is that not only the Secretary of the Interior, but also the two Districts constituting the Project geographically have joined in said contracts, that is, one District in the first contract, and the two Districts in the second contract, which rather forcibly negatives any such detriment, but, aside from that, taking the City's acquired lands out of irrigation did not at all lessen the water deliveries to other irrigated lands and neither would the City's lands going without crops perceptibly injure or damage any of the farming landowners. Instead, conceivably, it may have been a benefit.

In dealing with the authority of the Secretary of the Interior in making these contracts the point has been discussed as being a proper question of law raised in the case, but, in reality, it is doubtful that such authority is open to question by the defendant City, since same are acknowledged to be subsisting by the plaintiffs, and, in any event, the aspect of continuing executed performance by the plaintiffs is the main impact of said contracts in this suit.

The authority for such contracts, from the standpoint of the City,

---

74. Act of June 17, 1902, 32 Stat. 388, 43 U.S.C.A. § 431.
 "No right to the use of water for land in private ownership shall be sold for a tract exceeding one hundred and sixty acres to any one landowner, and no such sale shall be made to any landowner unless he be an actual bona fide resident on such land, or occupant thereof residing in the neighborhood of said land, and no such right shall permanently attach until all payments therefor are made."

75. Act of Feb. 21, 1911, § 2, 36 Stat. 926, 43 U.S.C.A. § 524; Act of Aug. 9, 1912, § 3, 37 Stat. 266, 43 U.S.C.A. § 543; Act of May 25, 1926, § 46, 44 Stat. 649, 650, 43 U.S.C.A. § 423e.

76. Act of Feb. 25, 1920, 41 Stat. 451, 43 U.S.C.A. § 521.
 "The Secretary of the Interior in connection with the operations under the reclamation act is authorized to enter into contract to supply water from any project irrigation system for other purposes than irrigation, upon such conditions of delivery, use and payment as he may deem proper: Provided, That the approval of such contract by the water-users' association or associations shall have first been obtained: * * * Provided further, That no water shall be furnished for the uses aforesaid if the delivery of such water shall be detrimental to the water service for such irrigation project, nor to the rights of any prior appropriator: * * *."

is clear enough.[77] The defendant City contends, however, that these particular contracts are vitiated by public policy and, particularly, the rule that municipal corporations in their legislative, governmental and police power functions cannot barter away their discretion and continuing responsibility for the public welfare or fetter themselves in the control and use of public property, and, of course, if these contracts violate that well settled principle same are invalid. The power of attorney provisions and the requirement that a resale of the City's water right lands must be confined to a qualified landowner under the Reclamation Act, quoted in a preceding footnote, are the particular target for the defendant's attack. In the first place, an important thing to keep in mind is that in the execution of the contracts in question the City was acting, not in its public or governmental capacity, but in its municipal and proprietary capacity.[78] True enough the power of attorney section of the contracts did tie the hands of the City to a degree in respect to any later disposition of the water right lands acquired by the City and in many transactions that kind of a restraint upon a municipality might be obnoxious to public policy, but that does not necessarily follow in all transactions. Such a restriction certainly can be legitimate where it is reasonable and works to a proper end within the framework of the particular transaction. In this instance, the contractual provision in question was not capricious, arbitrary or unreasonable. The plaintiffs did not solicit the defendant, but instead the defendant came to the plaintiffs seeking a supplemental supply of water, and this would be a special kind of transaction outside the ordinary routine of the Project. The City was not, although it might have been, within the bounds of the Project. The Secretary of the Interior, in the exercise of his discretion and judgment, was authorized to make such a contract with an outsider. He consented to do so and the way it was worked out, as most expedient to serve the purpose, there would be a deviation from the usual course of water service, since the water right lands which the City was to acquire, would be retired from irrigation and the water normally apportionable to such lands for irrigation would instead be delivered for municipal purposes of the City. All that the assailed terms of the contracts did was to safe-

---

77. The defendant's charter in Section 1 makes it capable "of contracting and being contracted with"; and provides that it "may take, acquire, hold and purchase, lease, grant, sell or convey such property, real, personal or mixed, as the needs or purposes of the corporation may require, either within or without the limits of the City, * * *". Then, Section 2 says, "it being intended by this Act to grant to and bestow upon the inhabitants of the City of El Paso full power of self-government, and it shall have and exercise all powers of municipal government not prohibited to it by this Charter or by some general law of the State of Texas, or by the provisions of the Constitution of the State of Texas." Still more explicit, Section 92 confers authority "To provide, or cause to be provided, the City with water; * * *."

78. City of Wichita Falls v. Lipscomb, Tex. Civ.App., 50 S.W.2d 867, (Writ refused). San Antonio Independent School Dist. v. Water Works Board of Trustees, Tex.Civ.App., 120 S.W.2d 861, (Writ re-

fused). City of Ysleta v. Babbitt, 8 Tex. Civ.App. 432, 28 S.W. 702. Lenzen v. New Braunfels, 13 Tex.Civ.App. 335, 35 S.W. 341. Community Natural Gas Co. v. Northern Texas Utilities Co., Tex.Civ. App., 13 S.W.2d 184. City of Crosbyton v. Texas-New Mexico Utilities Co., Tex. Civ.App., 157 S.W.2d 418, 420.

"In the exercise of its proprietary or business functions, however, such as those which it exercises when it enters into a contract for the private interests of its own inhabitants or of itself, a municipal corporation * * * is at liberty to exercise these powers in the same way and to the same extent as individuals or private corporations and it is settled by a long line of decisions of the courts of this state that the ownership and operation of public utilities, such as water works, electric light plants and street railways, is not a governmental function but is proprietary in its nature and constitutes a business or corporate function of the city."

guard the condition that on termination of the contracts the lands of the two Districts must remain intact as an irrigation project, and to that end the City would be bound to sell either directly, or under the power of attorney, all of its water right lands to one or more qualified landowners. Presumably, without such terms the plaintiffs would not have executed the contracts. The Supreme Court of Texas has authoritatively settled the controlling principle against the contention of defendant City,[79] and there are somewhat kindred cases from other courts.[80]

After all, the elements of the present question are not greatly different in principle from what the circumstances would be in event the defendant City should buy land any where subject to an outstanding debt, or issue water works revenue bonds, secured by a deed of trust, which authorized the trustee therein to make a sale in event of any default in payment of the lien debt.

 Even if a part of the contracts under discussion is invalid, that would not necessarily nullify the whole contract.[81]

The two contracts discussed above, not only reflect sufficient consideration, but are valid and binding in all parts, and the plaintiffs are entitled to recover from the defendant all unpaid sums accrued and due under such contracts.

## Contract of August 10, 1949

Under the above date plaintiff District and defendant City executed a writing in the tenor of a compromise contract. It grew out of the already mentioned application made by the City to the Board of Water Engineers of Texas for a water appropriation permit. The application sought to appropriate some of "the unappropriated storm and flood waters of the State of Texas, and the unused return flow water of the Rio Grande Project * * * for municipal and domestic use, from the Rio Grande in El Paso County, Texas." The protests aroused by said application have already been related herein. The application came on for initial hearing December 13, 1948, which continued for two days but was not closed. By agreement of all parties the Board took the application under advisement, and the matter thereafter was further postponed from time to time after an amicable disposal became a subject of discussion between the parties. This environment was the origin of the above writing dated August 10, 1949. The introductory recitals therein most material presently are quoted below.[82]

**79.** Guadalupe-Blanco River Authority v. City of San Antonio, 145 Tex. 611, 200 S.W.2d 989.

**80.** Interstate Materials Corp. v. City of Houston, Tex.Civ.App., 236 S.W.2d 653. Henry H. Stambaugh Auditorium Ass'n v. City of Youngstown, 73 Ohio App. 234, 55 N.E.2d 672. Allen v. City of Detroit, 167 Mich. 464, 133 N.W. 317, 36 L.R.A., N.S., 890. Clarke v. Inhabitants of Town of Brookfield, 81 Mo. 503, 51 Am.Rep. 243. Tillman v. Mayor, etc. of City of Athens, 206 Ga. 289, 56 S.E.2d 624. City & County of San Francisco v. Boyle, 195 Cal. 426, 233 P. 965. Omaha Water Co. v. City of Omaha, 8 Cir., 147 F. 1.

**81.** Sayles v. City of Abilene, Tex.Civ.App., 290 S.W. 239, affirmed Tex.Com.App., 295 S.W. 578. Kelly v. Merry, 262 N.Y. 151, 186 N.E. 425. City of Del Rio v. Ulen Contracting Corp., 5 Cir., 94 F.2d 701.

Gardner v. City of Dallas, 5 Cir., 81 F.2d 425.

**82.** "Whereas, there has been appropriated under the laws of New Mexico and Texas for and on behalf of the Rio Grande Federal Reclamation Project in New Mexico and Texas, * * * and appropriations have also been made for Hudspeth County Conservation and Reclamation District No. One, * * *, and the District claims all such appropriations cover all of the appropriable waters of the Rio Grande River for the irrigation of lands in said Districts; and,

"Whereas, in normal operation of the Rio Grande Project there are intermittent flows of water in the Rio Grande River in the vicinity of the City in excess of the requirements of the District and the Hudspeth District, resulting from Project developed drainage and return flow during periods of non-irrigation use, storm run off, and unavoidable

Both the City's application for a water permit and the second contractual recital, quoted in footnote 82, speak of storm and return flow waters, and at first that might be taken to indicate the crux of the supposed compromise, but a more attentive look brings home the reality that the storm and return flow waters described in the contract are at the same time waters which otherwise would be wastage from the District. In other words the plaintiffs already will have had prior use, so far as usable, of the water described in the contract, whether storm, drainage, return flow or waste water, before same comes to the hands of the defendant. There is no denial that water once rightfully in the custody of the plaintiffs for Project purposes, after initial use, can be recovered by return flow and used again, that is, a repeated use in the same project,[83] but the return flow water of this contract is distinctly surplus and will have no place to go for further irrigation in the Project, or even in the Hudspeth District.

Next, several pertinent contractual terms of the agreement will be set out in the margin.[84] The contract is hard to rationalize. The plaintiffs had a New Mexico appropriation and a Texas appropriation, and the defendant had pending an application for a water appropriation permit in Texas. The plaintiffs' Texas appropriation was far insufficient to cover the irrigation needs of the Texas lands in the Project, but was senior to the defendant's subsequent permit. Consequently, the said two perfected and

Project operating wastes due to sudden climatic changes occurring intermittently throughout the year, and other exigencies involved in the release and distribution of water for use upon said Project lands; and

\* \* \* \* \*

"Whereas, it is the desire of the District and the City to cooperate to the end of avoiding controversy and litigation between themselves and to settle and compromise their respective claims involving relative rights and priorities of use of the waters hereinabove referred to for domestic and irrigation purposes."

83. Ide v. United States, 263 U.S. 497, 44 S.Ct. 182, 184, 68 L.Ed. 407. "The evidence shows that the ditch is intended to collect project waters once used in irrigation, and found seeping or percolating where they are not needed, and to conduct them where they can be used in further irrigation. This plainly is an admissible purpose."

84. "1. The District, \* \* \* will permit use by the City of Rio Grande Project works serving the District lands, for the purpose of this agreement, to the extent, in the manner, and at such points, as will not interfere with the operation and use of such works for the benefit of the District and its lands, \* \* \*."

\* \* \* \* \*

"3. The determination of availability of such waters as to time, points of availability, and quantity, and the requirements of said two Districts from time to time, shall be made by said Project Manager, whose decision shall be final; and the diversion and use of such waters by the City shall be confined to and in conformity with such determination."

\* \* \* \* \*

"7. For use of the Project works, \* \* \* the City will pay to the District, \* \* \* charges at rates and in amounts as follows:

(1) For each and every acre-foot of water diverted and used by the City for the diversion and use of which project works are used, the City will pay at the same rate of charge per acre-foot then prevalent for excess water as made by the District against its lands. 'Excess water', as used in this paragraph, means those waters delivered to district lands, in addition to that which may be delivered to said lands by the District upon the payment of the District's minimum charge."

\* \* \* \* \*

"12. The City shall be free to prosecute to a conclusion, or dismiss, as the governing body of the City shall, in its judgment and discretion determine, the City's application now pending before the State Board of Water Engineers. \* \* \* whereunder the City seeks to appropriate waters of the Rio Grande \* \* \*. If the City shall elect to prosecute said application to a conclusion, any award or permit granted thereunder by the State Board of Water Engineers shall, by stipulation of the parties hereto filed in said proceeding, be made subject to the terms and conditions of this undertaking."

one prospective appropriations did not plausibly harbor any potential conflict except for the plaintiffs' contention that their New Mexico appropriation in effect has extra-territorial force and supplants the law of Texas in the control of water brought down the river from New Mexico for use in the Texas part of the Project. This proposition, seemingly, presupposes that Texas has no legal interest in the stream flowing down the Rio Grande while in New Mexico, but such a premise is repudiated by the Supreme Court.[85] The plaintiffs' other view that water rights under the New Mexico appropriation became appurtenant to the Project lands in Texas is a corollary of what has just been said and imputes to the law of New Mexico, aided by the Reclamation Act, the novel potency to settle an appurtenant in the nature of an incorporeal hereditament upon land in Texas. Either the law of Texas has a dominant place or is relegated to the background in this particular scheme of things, and the problem is not resolved by recognizing the state law in principle and denying it in practice. Of course, the impotency of the New Mexico appropriation in Texas is compensated by the Interstate Compact, but that has nothing to do with a proper analysis of the present contract.

■■■ The contest over the defendant's application for a permit did not come to a showdown. Under the contract in question the protestants withdrew their opposition, and defendant was expressly left free to prosecute its application to a conclusion, but with the reservation that any permit would be "subject to the terms and conditions of this undertaking". Manifestly, the parties contemplated that the prospective permit thereafter issued to the defendant could be of some force and validity. They did not profess to do more than make it subject to such contract. That stipulation itself is rather indefinite, but at most probably meant that defendant would not exercise any such permit in derogation of plaintiffs' claimed priority in the Rio Grande water used to irrigate Project lands. Even if it was a binding contract, the defendant by its permit at least acquired a right secondary to that of the plaintiffs. It follows, so far as this record shows, that the defendant has as good right as any one else to claim and receive the water in question, without paying for it as such, when

85. Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 58 S.Ct. 803, 805, 82 L.Ed. 1202.

"The La Plata River rises in the mountains of Colorado, flows in a southerly direction until it reaches the boundary of New Mexico and in the latter State until it empties into the San Juan River. The stream is nonnavigable; has a narrow watershed; and a large run-off in the early spring. Then the quantity flowing begins to fall rapidly; and during the summer months little water is available for irrigation. In each State the water of the stream has long been used for irrigation; and each adopted the so-called appropriation doctrine of water use. Under that doctrine the first person who acts toward the diversion of water from a natural stream and the application of such water to a beneficial use has the first right, provided he diligently continues his enterprise to completion and beneficially applies the water. The rights of subsequent appropriations are subject to the rights already held in the stream.

"The relative rights of all claimants to divert in Colorado water from the La Plata River were adjudicated in a proceeding under the Colorado Statutes. * * * The Ditch Company claimed that by reason of the 1898 decree it was entitled to all the water in the stream except that required to satisfy the Colorado priorities. If it had been permitted to draw all that water, none would have been available to the New Mexico water claimants, who, under similar laws, had made appropriations. Some of them were earlier in date than the Ditch Company's.

* * * * *

"It may be assumed that the right adjudicated by the decree of January 12, 1898, to the Ditch Company is a property right, indefeasible so far as concerns the State of Colorado, its citizens, and any other person claiming water rights there. But the Colorado decree could not confer upon the Ditch Company rights in excess of Colorado's share of the water of the stream; and its share was only an equitable portion thereof."

the plaintiffs are through with it for irrigation, whoever has the actual and legal first right to such water. Neither of the plaintiffs ever had any outright ownership of the water, but only an usufructuary interest. That interest in some residue would necessarily end sooner or later. Under the circumstances mirrored in this contract, there was nothing the plaintiffs had to sell, except a rental use of the Project works. In fact, the District must have the same viewpoint since the contract does not purport to make a sale of water as such, but simply evidences a kind of license to use Project works for a stipulated compensation.

Turning back now to pick up again, the perplexity thickens in trying to put a finger on what was compromised. It sounds simple enough to say each of the parties gained a quid pro quo by reciprocal concessions, in that the plaintiffs waived further opposition to defendant's application for a permit, while the defendant subordinated its prospective permit to the priority of plaintiffs in rights to waters of the Rio Grande, but that statement is questionable upon close inspection. The plaintiffs' Texas appropriation undoubtedly by law had priority against the defendant's permit, but, on the other hand, the plaintiffs' New Mexico appropriation intrinsically had no legal priority or other standing against the defendant's permit in Texas. Moreover, the plaintiffs' concession was practically nominal because the defendant's concession left the plaintiffs as well off to all intents and purposes as if they had continued their opposition and blocked the issuance of a permit to the defendant. These views suggest strongly that the contract lacks the consideration ingredient and is illusory in its aspect as a compromise pact, but a definite ruling is unnecessary since that question does not control the decision of the Court, and, besides, said contract is revocable by either party upon reasonable notice at any time.

■ In any event, the contract is valid in its aspect as a rental of Project works for use in delivery of water to the defendant. There is a noticeable analogy between the charge against the defendant in this instance and the charge authorized against a riparian owner under the terms of Article 7545 Revised Statutes of Texas 1925, Vernon's Ann. Civ.St. The defendant City has no right to recover payments made in the past under said contract, and will be bound to continue such payments in the future so long as the Project works are used as a means to deliver the water, but no such charge is justified for water of the kind described which is released into the river bed and taken by the defendant without use of any Project facilities in the immediate method of taking and receiving said water.

Sewage Effluent

■ The defendant City gets more than half of its municipal water supply from pumping wells, and the remainder comes from surface water, such as diversions from the Franklin Canal and the Rio Grande. At present its water output averages about 24 million gallons per day and it climbed to over 39 million gallons the peak day of 1954. In recent planning the City has taken steps to make sure of underground water reserves ample for many years and a consulting ground water hydrologist has reported that taking one nearby locality "At least 25 to 40 million gallons of fresh water per day, therefore, can be pumped from the ground water reservoir for a period of 100 years." This leaves no doubt that the City prudently anticipates it must rely on ground water for the greater part of its supply indefinitely. Such ground water, of course, constitutes new water in relation to the Rio Grande and the Project. The City has a sewage disposal plant on the river. In the contract of August 10, 1949, there is a paragraph relative to the sewage effluent of the City and providing in part, "It is further understood that after such effluent is discharged into the Rio Grande it constitutes part of the Project water supply." Such effluent is mixed with other Project water in the river and used

in irrigation of Project lands, so, presumably, after the effluent has been treated in the municipal sewage plant and diluted with other water the mixture is suitable for irrigation use and such practice does not conflict with public health and sanitation standards. The City stresses its point that over the last ten years and every such year, except one or two, its sewage outfall to the Rio Grande has exceeded its diversions from the Rio Grande and contends for some kind of proper credit on that account in its dealings and settlements with the plaintiffs. This issue becomes simpler when it is kept in mind that the act of the plaintiffs, in superimposing the Project upon the face of nature, has confused the means of identifying riparian waters and storm waters as the distinctions are made under the laws of this State. The two types of water are impounded indiscriminately and commingled behind the Elephant Butte Dam. Inevitably, when any release from such storage reaches Texas, it will be a blend of both types of water and this record fails to disclose any known means of ascertaining accurately the respective proportions of said two types in any given mass of water. Necessity impels a fresh approach in trying to work out the respective rights of the parties. The normal processes for dealing with water right conflicts are simply unworkable under the circumstances of this case. The apparent reason for the excess of sewer outfall over river diversions comes in part from the factor of new water produced in the City's pumping supply. In any event, the proof shows that the City puts in more outfall than it takes out water from the river and, consequently, the river diversion works no proven loss or damage to the plaintiffs or, for that matter, any one else concerned, and that ought to hold

true so long as the diluted effluent has irrigation utility as a lawful practice. The fair and equitable rule is that the City for the foreseeable future should be entitled to make direct diversions for municipal use from the river, without having to pay for such water so long as such diversions are less in volume than the outfall to the river. The City has no traditional riparian right to exercise, but it is located on the river, with many miles of river frontage, and may have some title to the bordering river bed, so there is no strain of equity in saying that the City must have some right, akin in a way to the riparian doctrine, to make free use of the river water to the extent above limited. In any event, the plaintiffs herein would have no strong ground for complaint, if they are unable to demonstrate any tangible or substantial injury. Some cases, with supporting analogy, are cited in the footnote.[86]

Canutillo Wells

██ The defendant City owns a tract of land at the side of the river some sixteen miles upstream and has drilled several water wells thereon, which have been and are contributing to the municipal water supply. The Government has constructed certain works in that same vicinity, including drains and laterals. All or part of the water pumped from said wells is put in and passes along said drains and laterals into the river, then goes down the river, forming a part of whatever body of water may be in the river at the time, next is diverted at the American Dam to the American Canal and the Franklin Canal until same, that is the water equivalent, is rediverted from the Franklin Canal to the defendant's water treatment plant. The Government takes the stand that it is entitled to compensation and has been demanding payment for the use of said

86. Texas Co. v. Burkett, 117 Tex. 16, 296 S.W. 273, 54 A.L.R. 1397. Brown v. Cunningham, 82 Iowa 512, 48 N.W. 1042, 12 L.R.A. 583. State v. American Fruit Growers, Inc., 135 Wash. 156, 237 P. 498. Smith v. Duff, 39 Mont. 382, 102 P. 984, 133 Am.St.Rep. 587. Rock Creek Ditch & Flume Co. v. Miller, 93 Mont. 248, 17 P.2d 1074, 89 A.L.R. 200. Garvey Water Co. v. Huntington Land & Improvement Co., 154 Cal. 232, 97 P. 428. Wiggins v. Muscupiable Land & Water Co., 113 Cal. 182, 45 P. 160, 32 L.R.A. 667, 54 Am.St.Rep. 337.

public works in the travel of such water from the well site to the plant. The defendant contends that it has a free right to use the river bed as a conduit or channel to carry said well water. The defendant does have the right,[87] but the defendant must pay for making use of said facilities in delivering said water, except that it is not bound to pay for any involuntary use of the American Dam and the two canals if it wants such water to stay in the river bed on down to its intake equipment at the water treatment plant, and it is mechanically feasible to make such segregation at the American Dam. The City is liable to pay reasonable compensation for what use it has been making and continues to make of such Government works.

A judgment will be entered in conformity with the findings, rulings and directions herein.

---

87. Parker v. El Paso County Water Imp. Dist. No. 1, 116 Tex. 631, 297 S.W. 737. Rock Creek Ditch & Flume Co. v. Miller, 93 Mont. 248, 17 P.2d 1074, 89 A.L.R.

200. Butte Canal & Ditch Co. v. Vaughn, 11 Cal. 143, 70 Am.Dec. 769. Miller v. Wheeler, 54 Wash. 429, 103 P. 641, 23 L.R.A.,N.S., 1065.